UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v.                                              )<br>)<br>JERRY GRAY,                            )<br>    Defendant.                           )<br>                                              ) | Criminal No. 1:24-cr-10254-AK |

## Sentencing Memorandum

*The Hurricane*

> "It didn't behave like anything you had ever imagined.
> The wind tore at the trees, the rain fell for days slant and hard.
> The back of the hand to everything. I watched the trees bow and their leaves fall and crawl back into the earth. As though, that was that.
> This was one hurricane I lived through, the other one was of a different sort, and lasted longer. Then I felt my own leaves giving up and falling. *The back of the hand to everything.* But listen now to what happened to the actual trees; toward the end of that summer they pushed new leaves from their stubbed limbs.
> It was the wrong season, yes, but they couldn't stop. They looked like telephone poles and didn't care. And after the leaves came blossoms. For some things there are no wrong seasons. Which is what I dream of for me."

Mary Oliver, *A Thousand Mornings.*

    Mr. Gray is a soft spoken and earnest young man who has weathered many storms in his twenty-eight years. As a young boy and teenager, Jerry endured the gale force winds of domestic violence and abuse inside his own home and family. Outside the walls of his home awaited the destructive presence of violence and danger – born of a community plagued with violent crime, poverty, and instability. As a child raised within these environments, there was nowhere for Jerry to ever truly be 'safe'. His exposure to violence and instability inside and outside of his home left indelible marks on him, and contributed to a maladaptive pattern of behavior that is reflected in his criminal history and the offense conduct in this case.

1

Today, however, Jerry is genuinely determined to cultivate a new season of his life, focused on personal growth and the achievement of his goals. As part of this determination, he has fully accepted responsibility for his offenses and has committed himself through a binding plea agreement to recommend a sentence of 51 months. Dkt. 36. His willingness to take responsibility for his actions and give up significant years of his life demonstrates his acceptance of responsibility and acknowledges the harm of his crimes. That period of incarceration, to be followed by three years of supervised release, is at the middle of the advisory guidelines range as calculated in the PSR. PSR at ¶ 183. This court should accept the plea agreement and impose the jointly recommended sentence because the length of the sentence, the advisory guidelines, and all the factors discussed below show that it is consistent with the factors set forth in 18 U.S.C. § 3553(a) and will result in a sentence that is sufficient, but not greater than necessary, to effectuate the purposes of sentencing. *United States v. Kimbrough*, 552 U.S. 85 (2007); *United States v. Booker*, 543 U.S. 220 (2005); *United States v. Martin*, 520 F.3d 87 (1st Cir. 2008); *United States v. Rodriguez*, 527 F.3d 221 (1st Cir. 2008).

I. **Jerry Gray's History and Characteristics**

Growing up, those who know Jerry best remember him as a loving and caring young boy, who excelled at sports and was raised in the church. *See Family support letters*, attached as Exhibit A. A young music lover, Jerry started learning how to play the drums at age 8, coming every Friday after school to his church for lessons. His love for the instrument grew and he quickly excelled, playing drums in the church band and at church concerts for many years throughout his childhood. *Id*.

Music, church, and sports were respites from Jerry's otherwise turbulent home life and the greater community he and his family lived in. Born and raised in the Roxbury neighborhood of Boston, Jerry and his three siblings were raised predominately by his mother, essentially a

2

single parent, who struggled to make ends meet for her children while their father cycled in and out of incarceration. The periods of time when Mr. Gray's father would return home from jail were marred with violence– his father physically abusing his mother, and, as collateral damage, himself and his siblings– until a conviction of first-degree murder[1] and sentence of life without parole removed his father from their home permanently when Jerry was almost ten years old. Outside the walls of his home –pervasive community violence and his own exposure to the murders of multiple close friends and family members took its toll on his own development.

Born of the abuse, trauma, and adverse childhood experiences ("ACEs")[2] he suffered as a child and teen, Mr. Gray was plagued by the lasting experiences of trauma, anxiety, fear over his own safety, perceived vulnerability, and feelings of helplessness. As a young adult, he lacked the tools needed to process these feelings. He did not understand how his trauma history triggered him, altered his decision making, and shaped the way he saw the world and those around him. Instead, in an attempt to protect himself against threats, both real and perceived, Mr. Gray developed incredibly mal-adaptive coping strategies, which included, among many other things, the ill-conceived, illegal choice to possess a gun, as well as the flawed decision making reflected in his criminal history and the offense before this Court. His involvement in the juvenile justice

---

[1] In July 2005, Jerry Gray's father was convicted of the first-degree murder of his uncle, as well as assault and battery with a dangerous weapon, and related firearm charges, of another uncle. Jerry Gray's father was also charged with the first-degree murder of his step-father – but was not convicted of this offense.

[2] Adverse childhood experiences (ACEs) are stressful or traumatic events that occurred during one's childhood. *See* CDC, *About Adverse Childhood Experiences*, available at: https://www.cdc.gov/aces/about/index.html. Research has found a direct link between childhood trauma and incarceration, linking higher ACE scores to notable negative behavioral, health, and social outcomes, which, if untreated, can eventually contribute to the likelihood of system-involvement later in life. American Psychologist, *Adverse Childhood Experiences Among Justice-Involved Youth: Data-Driven Recommendations for Action,* Am Psychol. 2021 ; 76(2): 268–283. doi:10.1037/amp0000769, available at: https://pmc.ncbi.nlm.nih.gov/articles/PMC8281579/

system, when he was 17 years old, derailed his education, and his later adolescence and twenties were marred with incarceration, instability, and an inability to escape the negative manifestations of trauma and PTSD.

However, despite these struggles, Jerry has accomplished some significant achievements and has meaningful bright spots in his life. He enjoys a close relationship with his mother and siblings, PSR at ¶¶ 52-58, and has their last support and love. Despite some earlier experimentation and use of substances, he was able to understand the negative ways they impacted him and, on his own, stopped his use. PSR at ¶ 175. While incarcerated pre-trial for this offense, Mr. Gray has also gained valuable insight into his past and what he must do in the future to succeed. He has reconnected with his faith, attending weekly services at Plymouth, and he has taken the time, over the last year, to work towards attaining his GED, studying for the HiSET exam while at Plymouth. Currently, he has passed four out of five of the subjects required to pass the HISET exam and obtain his GED. PSR at ¶ 177.

Upon release from custody, he hopes to have obtained his GED and plans to continue his education. He is interested in studying business, taking courses related to entrepreneurship, and would like to someday pursue a career in music management. His desire to continue his education and pursue higher education is reflective of his potential, ability, and an ardent desire to change. While he understands his plans may be challenging for those with a criminal record, Mr. Gray is up to the task and hopes to use the resources federal probation can offer in securing further education, training, and employment. The parties requested sentence will allow him to do just that.

## II.     Nature and Circumstances of the Offense

Mr. Gray was arrested for the instant offenses on August 29, 2024, consented to voluntary detention[3], and was detained pre-trial at Plymouth House of Correction from that date until the present. PSR, p.2.

The behavior underlying Mr. Gray's offenses, while inexcusable, inarguably culpable, and inherently damaging, was essentially non-violent behavior, involving, in Count One, a limited amount of cocaine[4] that Mr. Gray sold to a cooperating witness posing as a drug customer. In this instance, Mr. Gray's role was limited to one completed, and one aborted, street-level drug transactions in February and March of 2024, and did not involve the manufacturing, importing, or large-scale distribution of illegal substances. PSR at ¶¶ 97-101. Nor did they involve any weapons, threats, or violence of any sort, and did not include his involvement, in any way, in the pervasive and much higher level drug distribution and drug distribution conspiracy that is detailed in the PSR at paragraphs 16-96. Similarly, the firearm underlying the felon in possession offense of Count Two was not involved in the drug distribution and conspiracy conduct of paragraphs 16-96 nor was it involved in Mr. Grey's own two drug sales in February and March 2024. *See* PSR at ¶ 105-107.

After his arrest in August 2024, Mr. Gray promptly took responsibility for his offenses, waiving Indictment and entering his guilty plea on April 17, 2025 to a two-count superseding Information to one count of Distribution of and Possession with Intent to Distribute Cocaine and one count of Felon in Possession of a Firearm and Ammunition.

---

[3]     Docket Entry 17.
[4]     The total weight of cocaine involved in Mr. Gray's two drug transactions to the confidential witness totaled 9.2. PSR at ¶ 126.

5

> III. **The Court should strike assertions that Mr. Gray is a gang member from the Presentence Report because they are not supported by a preponderance of the evidence and Mr. Gray will receive increased classification points from the Bureau of Prisons based on inaccurate information.**

Mr. Gray has objected to the information in the presentence report that he is a gang member, as this assertion is not supported by actual evidence. Specifically, Mr. Gray is not a member of the "H Block" gang – a neighborhood area in Roxbury referred to as "H Block" (named as such because of the convergence of streets that begin with the letter H). As the PSR makes clear, Jerry was born and raised in the Roxbury neighborhood of Boston. Many, if not most, of his family members and childhood friends still live in that area. Mr. Gray, like many people uninvolved in gangs, chose to spend time with other men who live or used to live in the neighborhood where he grew up. This should not be regarded as credible evidence of gang-involvement.

The defense understands that the government included information about alleged gang membership in the description of the PSR offense conduct simply to describe the background of the investigation, not to make any definitive claims about such membership nor seek to prove it by a preponderance. The other reference to Mr. Gray's alleged gang-membership comes from a dated Boston police department (BPD) police report from 2014, that is now over a decade old and refers to conduct from when the defendant was an eighteen-year-old teenager. PSR at ¶ 150. This Court has not been presented with any actual evidence at all about *why* law enforcement claims Mr. Gray is a gang member. Nor is there any evidence about *when* this claim was originally made. As such, this Court should not accept law enforcement's untested assertions in the absence of actual credible and current evidence to support this claim.

Moreover, the BPD's Gang Database has been heavily criticized by the First Circuit Court of Appeals as a "flawed" database that labels people as "gang members" based on "an

6

erratic point system built on unsubstantiated inferences." *Diaz Ortiz v. Garland*, 23 F.4th 1 (1st Cir. 2022). Specifically, in *Diaz Ortiz*, the First Circuit, sitting *en banc* overturned an immigration court order that relied heavily on BPD's Gang Database, calling the database "flawed" insofar as it relies on "an erratic point system built on unsubstantiated inferences." *Id*. In fact, the Court was "shocked" by the activities that could lead one to be entered into the database, saying,

> Most significantly, the record contains no explanation of the basis for the point system employed by the BPD. The record is silent on how the Department determined what point values should attach to what conduct, or what point threshold is reasonable to reliably establish gang membership. That silence is so consequential because, during the period relevant to this case, the list of "items or activities" that could lead to "verification for entry into the Gang Assessment Database" was shockingly wide-ranging.

*Id.* at 36. The Court noted the heavy reliance on field observations reports of association with suspected gang members, with no allegations of criminal misconduct, in the database's point system.

> The 2017 form for submitting FIO reports to the database states that a "Documented Association" includes virtually any interaction with someone identified as a gang member: "[w]alking, eating, recreating, communicating, or otherwise associating with confirmed gang confirmed gang members or associates.

*Id.* at 36-37.

The Court went on to reference multiple scholarly articles about gang databases employing similar point systems that showed that these systems "cast too wide a net" and included people who were not involved in gangs. The articles found that people living in "gang heavy communities" were more likely to be falsely included in gang databases and this resulted in "overstating minority participation." *Id.* at 37.

Without reliable evidence of Mr. Gray's actual, present gang involvement, the Court should not accept the assertion that Mr. Gray is a gang member. In this case, gang membership is

7

not related to an essential element of the offenses of conviction in this case and is not a fact to which Mr. Gray would have been required to admit sufficient facts. This information is also unnecessary to the Court's determination of an appropriate criminal history score for this case, or for overall sentence considerations. As such, it amounts to nothing more than unsubstantiated bad character evidence. Mr. Gray asks that the Court limit its sentencing determination to reliable and relevant evidence and argument.

Moreover, although alleged gang membership does not affect the guidelines calculation here, it will affect Mr. Gray's designation by the BOP. Under BOP Program Statement P5100.08, membership in a "Disruptive Group" will be applied as Public Safety Factor. Exhibit D, Excerpt of BOP Program Statement P5100.08, full text at https://www.bop.gov/policy/progstat/5100_008cn.pdf, Chapter 5, pp. 7, 12. Under the BOP's calculation, any inmate who receives a Disruptive Group factor will be categorized as High Security, *regardless of the other applicable security points*. *Id*. at p. 12, Table 5-2. This is a serious consequence that will result in a much more restrictive and harsher form of incarceration for Mr. Gray. As the claim of gang membership is unsupported by current and credible evidence, is not relevant conduct, and will result in serious consequence for Mr. Gray, he thus requests the Court order the presentence report be amended to remove the allegations of gang membership.

### IV.    A Sentence that is Sufficient but Not Greater Than Necessary

As in all sentencing proceedings, the Court's determination comes down to deciding what punishment is fair, necessary, and appropriate, given all of the relevant facts and circumstances; or, in the words of 18 U.S.C. § 3553(a), establishing what sentence is "sufficient but not greater than necessary." "Imposing a sentence on a fellow human being is a formidable responsibility," compelling "a court to consider, with great care and sensitivity, a large complex of facts and factors." *United States v. Gupta,* 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012). The Court must

conduct a "more holistic inquiry" than simply plugging numbers into a guidelines calculation, and "section 3553(a) is more than a laundry list of discrete sentencing factors; it is, rather, a tapestry of factors, through which runs the thread of an overarching principle." *United States v. Yonathan Rodriguez*, 527 F.3d 221, 228 (1st Cir. 2008) (citing *Kimbrough v. United States*, 128 S.Ct. 558, 570 (2007)). That overarching principle is to "impose a sentence sufficient but not greater than necessary." *Id*. In reaching a decision on what constitutes an appropriate sentence, the district court should "consider all the relevant factors" and "construct a sentence that is *minimally sufficient* to achieve the broad goals of sentencing." *Id.* (emphasis added).

In addition to consideration of other §3553(a) factors, such as the nature and circumstances of the offense and Mr. Gray's history and characteristics, addressed above, the Court must fashion a sentence that satisfies the four needs a sentence must fulfill. Put simply, those needs are: punishment, deterrence, incapacitation, and rehabilitation. *See* 18 U.S.C. §3553(a)(2). The parties jointly requested sentence of 51 months incarceration fulfills those needs.

A sentence of 51 months reflects the seriousness of the offense, provides just punishment, and promotes respect for the law. Now that Mr. Gray has been charged and convicted (for the first time) in the federal system, he has finally received a serious and impactful reality check. For Mr. Gray, 51 months is a significant period of incarceration that not only represents the seriousness of his offense but drives home the message, and his understanding, that he should absolutely not have had possession of a firearm and the danger he put himself and his community in by doing so, and by engaging in the two drug transactions and early 2024. The requested sentence also serves as an adequate deterrent.[5] It represents a significant sentence and provides

---

[5]     Research has consistently indicated that the certainty of punishment is more effective at achieving general deterrence than the severity of punishment. Indeed, "increases in severity of

for the longest period of probation Mr. Gray will have ever been subjected to. He further understands his past will always follow him and that any future offense will likely result in significantly more serious repercussions. Mr. Gray's requested sentence also places emphasis on his continued rehabilitation. The agreed-upon sentence, which includes three years of supervised release with vocational services support and training, will provide him with the structure and supported needed to chart a new course for himself upon his release. The danger of any future sentence, resulting in even longer time without any real opportunity to accomplish the goals he has for himself and his future, will serve as a strong reminder to Mr. Gray: to keep himself compliant on Supervised Release and to be the productive member of society he knows he can be.

    Although a period of incarceration longer than the parties request would certainly exist incapacitate him further, the costs cannot be justified. It will prolong his separation from his

---

punishments do not yield significant if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006). "Three National Academy of Science panels ... reached that conclusion, as has every major survey of the evidence." *Id*. *See also* Zvi D. Gabbay, *Exploring the Limits of Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (207) ("certainty of punishment is empirically known to be a far better deterrent than its severity."); Steven N. Durlauf & Daniel S. Nagin, *Imprisonment and Crime: Can Both be Reduced?*, 10 Criminology & Pub. Pol'y, 37 (2011) ("The key empirical conclusions of our literature review are that at prevailing levels of certainty and severity, relatively little reliable evidence of variation in the severity of punishment having a substantial deterrent effect is available and that relatively strong evidence indicates that variation in the certainty of punishment has a large deterrent effect, particularly from the vantage point of specific programs that alter the use of police."), available at: http://onlinelibrary.wiley.com/doi/10.1111/j.1745-9133.2010.00680.x/pdf; Raymond Pasternoster, *How Much Do We Really Know About Criminal Deterrence*, 100 Crim. L. & Criminology 765, 817-18 (2010)(There is "no real evidence of a deterrent effect for severity ... [I]n virtually every deterrence study to date, the perceived certainty of punishment was more important than the perceived severity.").

community and family, diminish his potential earning capacity, isolate him from developing pro-social connections in the community, delay his productive contribution to society, and risk exacerbating his mental health. It would all but halt his rehabilitation, offer no additional deterrent value, stymie meaningful retribution, and subvert the additional sentencing goals of 18 U.S.C. § 3553(a)(2). As such, the parties' recommended sentence - which includes a substantial period of isolation away from his family, loved ones, and community, followed by 3 years of federal supervision in the community - satisfies each of the sentencing criteria at issue in this case.

## CONCLUSION

This Court should "consider every convicted person as an individual and every case as a unique study in human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). The late Chief Justice Gants of the Massachusetts Supreme Judicial Court pressed that a "sentence should be crafted to best enable the defendant […] to 'get past the past,' that is, to address the problems that brought the defendant to the courtroom in order to diminish the risk that he […] will commit additional crimes."[6] The parties' agreed upon recommendation for a sentence of 51 months years in federal prison, followed by 3 years supervised release, are crafted specifically to enable him to get "past the past," and to address the very issues which caused to him to offend in the first place.

        Respectfully Submitted,
        Mr. Jerry Gray
        By his attorney:

        */s/ Forest O'Neill-Greenberg*
        Forest O'Neill-Greenberg
        BBO No. 674760
        Federal Defender Office

---

[6] Remarks by Chief Justice Ralph Gants, Supreme Judicial Court, Univ. of Mass. – Boston, Mar. 16, 2015.

51 Sleeper Street, 5th Floor  
Boston, MA  02210  
Tel: 617-223-8061

**CERTIFICATE OF SERVICE**

    I, Forest O'Neill-Greenberg, certify that on this 24th of July 2025, I served one true and correct copy of this motion, through the electronic filing system, on all counsel of record in this matter.

*/s/ Forest O'Neill-Greenberg*  
Forest O'Neill-Greenberg
